**SO ORDERED.**

**SIGNED November 16, 2026.**

JOHN W. KOLWE
UNITED STATES BANKRUPTCY JUDGE

---

**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISON**

**IN RE:**
**BELL FAMILY TRUST** — **CASE NO. 02-50477**

**Chapter 7**

*Debtor*

---

**BELL FAMILY TRUST, THROUGH W. SIMMONS SANDOZ, TRUSTEE,**

*Plaintiff* — **ADVERSARY PROCEEDING NO. 02-5045**

**VERSUS**

**MARY SUE BELL, SUE BELL HOLDINGS, L.L.C., and AMERADA HESS CORPORATION,**

*Defendants*

# MEMORANDUM OPINION

On August 1, 2005, following a trial on the merits, this Court entered judgment (the "Judgment") against the Defendants, Mary Susan Bell ("Ms. Bell") and Sue Bell Holdings, L.L.C., Ms. Bell's wholly owned limited liability company, and in favor of the Plaintiff, the Bell Family Trust. On July 28, 2025, the Trust, acting through its

Trustee, Greg Mier, filed an ex parte Motion to Revive the Judgment.[1] The Court granted this Motion on August 5, 2025 (the "Judgment of Revival").[2]

Ms. Bell filed a Contradictory Motion on January 15, 2026, seeking to annul and cancel the Judgment of Revival on the grounds that the underlying Judgment has been satisfied through payment and return of Trust property.[3] The Trust opposes this Motion, claiming that Ms. Bell is not entitled to any credit towards the Judgment because she did not voluntarily make repayment or, in the alternative, she is not entitled to credit for return of the Trust property because she cannot prove timely return. Thus, the Trust asserts that Ms. Bell still owes the full amount of the original Judgment plus interest.

The Court held an evidentiary hearing on this matter, which was attended by Ms. Bell, appearing pro se, Ms. Christy Dew, the Trust's accountant, who was subpoenaed by Ms. Bell to verify accounting records, and Mr. Greg Mier, the Trustee and the Trust's attorney. The Court took this matter under advisement following the hearing. The Court has reviewed the entire record of this matter and considered the parties' arguments. For the following reasons, the Court finds the Judgment has been satisfied. Accordingly, the Court will enter an Order annulling the Judgment of Revival.

## BACKGROUND AND FINDINGS OF FACT

### A. Formation of the Trust and Litigation History

The Trust was created by Wilfred Bell on October 8, 1996, naming his six children as beneficiaries. Ms. Bell, who is a beneficiary, was also named the initial Trustee. When the Trust was created, Wilfred Bell had been arrested and charged with multiple counts of sexual exploitation. The criminal proceeding included an effort by the government to provoke a forfeiture of Mr. Bell's home and surrounding

---

[1] Mtn. to Revive Judgment, (7/28/2025), ECF 266.
[2] Order Granting Mtn. to Revive Judgment, (08/05/2025), ECF 268.
[3] Contradictory Mtn., (01/15/2026), ECF 298.

property. Thus, the primary purpose of the Trust was to shield Wilfred Bell's assets from forfeiture.[4]

Mr. Bell transferred two parcels of property to the Trust via Acts of Donation. The first occurred on October 8, 1996, when he donated 288 acres of farmland. The second, also dated October 8, 1996, consisted of Wilfred Bell's house and surrounding one acre. Although dated October 8, 1996, the second donation was not recorded in the public records until April 10, 2000. In the meantime, in March 1997, Mr. Bell purported to grant a mortgage on his home in favor of Ms. Bell to secure a $40,000.00 loan that Ms. Bell allegedly made to Mr. Bell in her personal capacity.

Ms. Bell, as trustee, paid distributions to all the beneficiaries of the Trust, but those payments ceased in 2001. This prompted the other beneficiaries of the Trust to investigate, which led to the discovery that Ms. Bell had transferred the Trust property and corresponding income to herself. She claimed that this was done to reimburse her for work she had performed on behalf of the Trust. The Bankruptcy Court summarized the steps Ms. Bell took to seize control of the Trust property as follows:

> On August 21, 2001, Ms. Bell formed the LLC [Sue Bell Holdings], and on August 30, 2001, Mr. Gauthier [the Trust's attorney and Mr. Bell's criminal attorney] prepared a Dation En Paiement and Termination of Trust ("Dation"). The Dation was signed by Ms. Bell as trustee of the Trust and as agent for the LLC. In addition, an Act of Exchange was executed whereby Ms. Bell transferred her alleged claim for compensation to the LLC.
>
> The Dation terminated the Trust as to Ms. Bell, and purportedly to distribute her interest in the Trust, transferred the following Trust assets to the LLC: (1) 185 of the 288 acres, (2) 100% of the mineral rights for all of the acreage, and (3) miscellaneous assets including a $16,000

---

[4] *See In re Bell Fam. Tr.*, 350 B.R. 700, 702 (Bankr. W.D. La. 2005), *subsequently aff'd as mod.*, 251 F. App'x 864 (5th Cir. 2007).

> note due from Nedia Bell, the Bell family home and one acre and some co-op stock.[5]

The beneficiaries sought an accounting of the Trust from Ms. Bell in state court. This led Ms. Bell to file a chapter 7 bankruptcy proceeding in this court on behalf of the Trust. At that point, W. Simmons Sandoz was appointed chapter 7 Bankruptcy Trustee (the "chapter 7 trustee"). In November 2002, Mr. Sandoz filed this adversary action on behalf of the bankruptcy estate and the Trust against Ms. Bell and Sue Bell Holdings, LLC, seeking a return of the Trust property and related income. That litigation resulted in the August 1, 2005, Judgment currently at issue.

Thereafter, the chapter 7 trustee pursued return of the Trust assets and administered the assets of the Trust for an additional seven years until the Trust's bankruptcy case was closed in early 2012. The beneficiaries of the Trust then selected Greg Mier as the successor Trustee, and Mr. Mier has administered the Trust assets from 2012 through the present. Ms. Bell remains a beneficiary of the Trust.

### B. The Money Judgment

The Judgment essentially awarded three elements of relief in favor of the Plaintiff and against Ms. Bell: (1) it imposed a money judgment on Ms. Bell; (2) it declared null and void the transactions by which Ms. Bell had transferred Trust property to her control; and (3) it required return of the property transferred from the Trust. The Judgment also provided that one of the components of the damage award, the award of $266,468.60 for breach of fiduciary duty, would be satisfied upon return of the improperly transferred Trust property to the Trust.

At issue here is whether Ms. Bell has satisfied the money judgment. Paragraphs 1, 2, 3 and 5 of the Judgment assessed money damages against Ms. Bell. Paragraphs 1, 2 and 3 awarded $162,214.96, $266,468.60 and $60,000.00,

---

[5] *Id.* at 703.

respectively, for breach of fiduciary duty. Paragraph 5 awarded $18,009.97 for income Ms. Bell had received after transferring the assets to herself.

The Bankruptcy Court's "Reasons for Decision" explain the basis for each monetary award made to the Plaintiff.[6] The $162,214.96 referenced in Paragraph 1 represented cash transferred out of the Trust by Ms. Bell to herself to pay expenses which were "unrelated to Trust business." The $266,468.60 referenced in Paragraph 2 is the stated value of the property transferred from the Trust to Ms. Bell "via the Dation." Finally, the $18,009.97 referenced in Paragraph 5 represented "income received by Ms. Bell" from the Trust property after the property had been improperly transferred to her. The Reasons for Decision did not separately identify the $60,000.00 that was awarded in Paragraph 3.

The Judgment also allowed a portion of the money judgment to be satisfied by return of the Trust property transferred out of the Trust by Ms. Bell. Under Paragraph 10 of the Judgment, Ms. Bell could satisfy the sum assessed in Paragraph 2, which is $266,468.60, "upon [her] compliance . . . with item nos. 7, 8 and 9" of the Judgment.[7] Paragraph's 7, 8 and 9 declared the following three agreements, respectively, null and void: (i) Dation en Paiement dated August 31, 2001, (ii) Act of Exchange dated August 31, 2001, and (iii) Termination of Trust and Distribution of Property dated August 31, 2001. Since these transactions were nullified, Paragraphs 7, 8 and 9 also required Ms. Bell and Sue Bell Holdings, L.L.C. to deliver and convey, "via [an] act translative of title," all of the property identified in each of those agreements back to the Trust "within twenty (20) days."[8] Upon such reconveyance, the amount assessed in Paragraph 2, $266,468.60, would be considered "satisfied." The return of the Trust property would also satisfy Paragraph 4 of the Judgment, which cast Ms. Bell in judgment for return of "all property transferred from the Bell

---

[6] *Id.* at 704-08.
[7] Judgment, (08/01/2005), ECF 144; Exhibits Admitted in Open Court and Witness List, (02/10/2026), ECF 311, Bell Ex. 5.
[8] Judgment, (08/01/2005), ECF 144 ¶¶ 7 – 9.

Family Trust via Dation en Paiement and Termination of Trust and Distribution of Property."[9]

Ms. Bell appealed the Judgment to the United States Court of Appeal for the Fifth Circuit. The Fifth Circuit apparently had concerns that the Judgment may include a double recovery. Charles R. Fulbruge, III, Clerk of Court for the Fifth Circuit, by letter dated September 10, 2007, requested that Mr. Jeffrey Ackermann, the attorney for the chapter 7 trustee, address that issue.[10] On September 13, 2007, Mr. Ackermann responded in writing to the Fifth Circuit, stating:

> I. **Mary Sue Bell** has not been double charged by the judgment which seeks return of the trust property and assesses a money judgment in the amount of $266,468.60.
>
> Item 10 of the judgment of the bankruptcy court states: *"Upon compliance by Mary Sue Bell and Sue Bell holdings, LLC with items Nos. 7, 8 and 9 above, the relief under USC 550 for violations of 11 USC 548, and relief under La. R.S. 9:2221, as assessed in paragraphs 2 and 4 above, shall be satisfied."* Items 7, 8 and 9 are for recovery of the property transferred via Dation En Paiement, Act of Exchange, and Termination of Trust. Item 2 assesses the money judgment against Mary Sue Bell and Sue Bell Holdings, LLC in the amount of $266,468.60. This was the amount of the alleged debt that supported the transfer. Accordingly, upon recovery of the trust property, the dollar amount assessed in item 2 will be "*satisfied*". The preferred remedy is restoration of the trust property and upon same the monetary award of $266,468.60 is satisfied. As such there seems like there can be no duplicate recovery or duplicate award.
>
> II. The $60,000.00 award and the $162,214.96 award.
>
> Appellee has reviewed the testimony of plaintiff's witness Lou Rolfes, CPA and a copy of the report produced by him in evidence as PE 50. Appellant's brief to the District Court was also reviewed. At no time did Appellant raise this argument at trial or after except for a quick reference in her brief to this court. Yet my review also shows that the $162,214.96 does include the $60,000.00 *"retainer"*. Unlike the $266,468.60, for which trust property was taken by Mary Sue Bell the $60,000.00 was paid to Mary Sue Bell in cash prior to the transfer of

[9] *Id.* at ¶ 4.
[10] The record of this matter does not include the Fifth Circuit's letter to Mr. Ackerman.

> trust property and was not part of the $266,468.60. As such it would not be *"recovered"* by the trust in the event that the transfer of property is avoided, like the $266,468.60 would be recovered. Nevertheless, it does appear that the $162,214.96 awarded in item number 1 of the Bankruptcy Court award was calculated including the $60,000.00 cash retainer referenced in item 3 of the judgment and to that extent is duplicative.
>
> Pursuant to FRCP 60 an error in a judgment from an oversight or omission may be corrected while the appeal is pending. Appellant contends that to the extent correction is required, the numerical calculation of $162,214.96 could be reduced by $60,000.000 or down to $102,214.96 and the award of the $60,000.00 in item number 3 of the judgment remain. Alternatively, the award of $60,000.00 could be reversed and the $162,214.96 upheld. We do not believe that such calls for full reversal or remand for retrial.[11]

Days later, the Fifth Circuit affirmed the Judgment with one modification. It found, presumably based on the Ackermann Letter, that the $60,000.00 "retainer" awarded as damages in Paragraph 3 was duplicative because that amount was already included in the $162,214.96 awarded in Paragraph 1 of the Judgment, and thus found that Paragraph 3 should be "stricken" from the Judgment:

> The $162,214.96 awarded in item number 1 of the bankruptcy court judgment was calculated including the $60,000 cash retainer referenced in item number 3 of the judgment and therefore the award, to that extent, is duplicative. Appellee agrees that the award is duplicative. The judgment should be modified so that the award of $60,000 is stricken and the $162,214.96 is upheld.[12]

Thus, following the Fifth Circuit's modification, the total monetary award against Ms. Bell was $446,693.53, which is the sum of the amounts awarded in paragraphs 1, 2 and 5 of the Judgment.

---

[11] Letter from Jeffrey Ackermann to Charles R. Fulbruge, III, Clerk of Court, U.S. Ct. of App. for the 5th Cir. (09/13/07), filed (09/14/07), ECF 273-2 (the "Ackermann Letter") (emphasis in original).

[12] *In re Bell Fam. Tr.*, 251 F. App'x 864, 865 (5th Cir. 2009).

### C. Prejudgment Interest

The Judgment was to bear interest based on the Louisiana legal rate from the date of judicial demand, which was November 12, 2002, to the date of Judgment, August 1, 2005.[13] Thereafter, the Judgment bears interest at the federal rate until paid.[14]

Ms. Bell's Amortization Schedule does not include prejudgment interest. The Trustee claims his Amortization Schedule includes the prejudgment interest, but the amount is not separately disclosed. The Trustee's Amortization Schedule shows the August 1, 2005, starting balance on the Judgment as being $531,901.41.[15] As noted in the previous section of this Opinion, the principal balance of the Judgment is $446,693.53. Thus, the Trustee's starting balance for the Judgment is $85,207.88 more than the principal balance ($531,901.41 - $446,693.53). The Trustee explained during the hearing that this difference represents the prejudgment interest and that he personally calculated the prejudgment interest using an online calculator.

Since neither party provided the actual calculation of the prejudgment interest, the Court used the calculator available on the Louisiana State Bar Association's website to verify the prejudgment interest. Based on that calculator, the Court determined the prejudgment interest is $62,711.49. This amount was calculated based on the principal amount of the Judgment, $446,693.53, with interest running at the Louisiana legal rate from the date of judicial demand, i.e., the date this adversary proceeding was filed, which was November 12, 2002, through the date of Judgment, August 1, 2005. Thus, the prejudgment interest appears to be $62,711.49, which is $22,496.39 less than the prejudgment interest as calculated by the Trustee.

---

[13] Judgment, (08/01/2005), ECF 144 at 2.

[14] *Id.*

[15] The beginning balance is identified on the Trustee's Amortization Schedule as the "Loan." *See* Exhibits Admitted in Open Court and Witness List, (02/10/2026), ECF 311 at Trustee's Ex. 3.

It is unclear how the Trustee determined the prejudgment interest. Since the Court cannot replicate the Trustee's number, and was able to calculate the interest using a reliable online calculator, the Court finds that the prejudgment interest is $62,711.49.[16]

### D. Collection efforts and payments on the Judgment

The chapter 7 trustee began enforcing the terms of the Judgment on September 16, 2005, when he filed a Motion for Entry of Judgment under Bankruptcy Rule 7070 seeking to have record title of all the Trust's immovable property, including without limitation, the farmland, Mr. Bell's home and surrounding one acre, and the mineral interests, placed back in the name of the Trust.[17] This Motion was granted on November 9, 2005.[18]

The Rule 7070 Motion, however, did not effectuate a return of the Trust property that was not susceptible to recordation, and the parties dispute whether those properties were returned. The disputed properties are: (i) the August 31, 2001, promissory note in the amount of $16,279.13 executed by Nedia Leleux Bell and payable to the Trust, and due on the date of Nedia Bell's death, and secured by a collateral mortgage note and corresponding collateral mortgage dated August 31, 2001, on Nedia Bell's home (the "Nedia Bell Note"), (ii) 383 shares of stock in Kaplan Farmers' Co-op, Inc., and (iii) $1,141.51 in cash. The parties also dispute whether Ms. Bell conveyed to the Trust a $40,000.00 promissory note dated March 12, 1997, executed by Wilfred Bell and payable on demand to Ms. Bell, and secured by a collateral mortgage dated March 12, 1997, purporting to encumber Wilfred Bell's home and surrounding property (the "Wilfred Bell Note"). The Court will address the factual and legal issues regarding these disputed properties in its Discussion below.

---

[16] The Court also manually calculated the prejudgment interest based on the Louisiana legal rates in effect for the applicable time periods and arrived at the same number, $62,711.49.
[17] *See* Mtn. for Entry of Judgment Pursuant to BR 7070, (09/16/2005), ECF 151.
[18] *See* Judgment, (11/09/2005), ECF 160.

Next, the chapter 7 trustee filed a Writ of Garnishment on March 5, 2009, against Ms. Bell's employer, Hercules Offshore, Inc.[19] According to the Chapter 7 Trustee's Final Account of Distribution, from July 1, 2009, through May 10, 2011, the Trust collected $20,179.40 from Hercules as a result of the garnishment and denoted these payments as: "PAYMENT ON JUDGMENT" within his records.[20] Ms. Bell's Amortization Schedule reflects the garnished wages as payments on the Judgment. The Trustee's Schedule does not.

Third, beginning on July 1, 2011, Ms. Bell was internally credited by the Trust for withheld distributions.[21] Between July 1, 2011, and September 7, 2022, the Amortization Schedule submitted by Ms. Bell and the Amortization Schedule submitted by the Trust both show that $273,550.00 of distributions were withheld from Ms. Bell and applied against the Judgment.[22]

Finally, the Trust made an additional major collection effort against Ms. Bell in 2021. The Trustee filed a Writ of Fieri Facias in the 15th Judicial District Court on April 19, 2021, asserting the 2005 judgment was wholly unsatisfied.[23] This Writ directed the seizure and sale of Ms. Bell's personal home in Lafayette Parish on May 18, 2022, via Sheriff's Sale.[24] Ms. Bell was internally credited $29,206.79 by the Trust for the proceeds it received from the sheriff's sale.[25] The proceeds from the sale of

[19] Application For Writ of Continuing Garnishment, (03/05/2009), ECF 153 in Case No. 02-50477.
[20] Chapter 7 Trustee's Final Account of Distribution & Application for Closing & Discharge, (02/10/2012), ECF 256 in Case No. 02-50477. This Accounting denotes each payment received from Hercules in 2009, 2010 and 2011. When added, the Trustee received $7,045.07 in 2009, $10,938.91 in 2010, and $2,195.42 in 2011. *See* Exhibits Admitted in Open Court and Witness List, (02/10/2026), ECF 311, Bell Ex. 1B at 14.
[21] *See* Exhibits Admitted in Open Court and Witness List, (02/10/2026), ECF 311 at Trustee's Ex. 3; *see also id.* at Bell Ex. 1, 1A, and 1-B.
[22] This amount is comprised of distributions withheld between June 21, 2011, and September 7, 2022. *Id.*; *see also id.* at Bell Ex. 1 (Yellow flags, added by accountant Christy Dew, denoting distributions made by the Trust).
[23] Obj. and Rebuttal to the Gregory Mier Opp'n to Bell's Contradictory Mtn., (02/09/2026), ECF 308 at 25-28.
[24] *See id.* at 29.
[25] *See* Exhibits Admitted in Open Court and Witness List, (02/10/2026), ECF 311 at Trustee's Ex. 3; *see also id.* at Bell Ex. 1, 1-A, and 1-B.

Ms. Bell's home are reflected on both Ms. Bell's and the Trust's Amortization Schedule. This is the extent of collection activities and payments on the Judgment.

In summary, it appears $322,550.19 has been collected by the Trust for payment on the Judgment. This amount consists of: (i) garnishment of Ms. Bell's income from her employer, Hercules ($20,179.40) (ii) retention of distributions that were payable to her as a beneficiary of the Trust ($273,550.00), and (iii) the sale of her Lafayette Parish home ($29,206.79). This amount is reflected as the "Grand Total" under the "Payment" column on the last page of Ms. Bell's Amortization Schedule.[26]

The Trustee's Amortization Schedule is essentially identical to Ms. Bell's except that the "Grand Total" column in the Trustee's Schedule shows the total payments as being $302,756.59. The difference is $20,179.40, which is the amount of Ms. Bell's wages that were garnished by the chapter 7 trustee.[27] As will be discussed below, the Court finds that Ms. Bell is entitled to credit for her garnished wages.

Accordingly, the Court finds that title to all the real estate that belonged to the Trust was placed back into the Trust's name on November 9, 2005. Additionally, the Trust has received a total of $322,936.19 from the garnishment of Ms. Bell's wages, retention of Ms. Bell's share of distributions as a beneficiary of the Trust, and the sale of Ms. Bell's Lafayette Home.

## E. The Trustee Seeks Termination of the Trust

Through a June 2023 letter, the Trustee recommended that the Trust be terminated.[28] Included with his letter was a document entitled "Termination of Bell Family Trust, Distribution of Trust Property, and Release of Trustee" (the "Draft

---

[26] *See id.* at Bell Ex. 1-B, 16.
[27] *See id.* at Trustee's Ex. 3 and Bell Ex. 1, 1-A, and 1-B; *see also* Chapter 7 Trustee's Final Account of Distribution & Application for Closing & Discharge, (02/10/2012), ECF 256 in Case No. 02-50477; Order Granting Final Decree, (02/14/2012), ECF 257.
[28] *See* Contradictory Mtn. (01/15/2026), ECF 298 in Case No. 02-50477 at Ex. 2.

Termination Agreement"). Also included was a document entitled "The Bell Family Trust Accounting 2013 – 2023," which was prepared by Darnall, Sikes & Frederick, the accounting firm that the Trustee hired to handle the Trust's accounting issues. The letter asked that each beneficiary sign the Termination Agreement acknowledging their agreement to terminate the trust and denoting their acceptance of the accounting and the release of the Trustee.

The Draft Termination Agreement provides a brief history of the Trustee's actions in administering the Trust property and ultimately selling all Trust Property. It also discusses the Judgment against Ms. Bell. With respect to the Judgment, it shows that the balance due as of the date of the Judgment, August 1, 2005, was $531,901.44. The Draft Termination Agreement also indicates that the current balance on the Judgment, including post-judgment interest, is $345,360.21:

> Over the years since the rendering of the August 1st Judgment, offsets have been applied to the amount of the money owed on the Judgment. As of 12/31/22, the remaining amount of money owed on the Judgment was $345,360.21 (including interest). . . .[29]

Other than a small amount of cash, it appears the only remaining asset of the Trust is the Judgment against Ms. Bell.

Ms. Bell did not accept the Trustee's accounting, particularly his accounting for payments on the Judgment, and she emailed the Trustee the basis of her rejection. She claims the Trustee should have given her credit for the Trust property returned because otherwise she is subjected to a double recovery. She referenced the Ackermann Letter, in which Mr. Ackermann assured the Fifth Circuit that there could be no duplicate recovery.

In response, the Trustee asserted he did not need to see, nor would he consider, any evidence outside of the language of the Judgment and the affirmation from the

---

[29] Obj. and Rebuttal to the Gregory Mier Opp'n to Bell's Contradictory Mtn., (02/06/2026), ECF 308 at pg. 37 of 99.

United States Fifth Circuit.[30] He insisted to Ms. Bell that the Ackermann Letter was irrelevant,[31] and that there was nothing Ms. Bell could provide, aside from an unequivocal ruling from the United States Fifth Circuit, that would convince him to treat the property portion of the judgment satisfied.[32]

In response to Ms. Bell's threat to pursue the Trustee for fraudulent collection efforts, the Trustee advised:

> When your house at 101 Chateau Place was seized and sold, the only documents presented to the court to prove your debt were the 5th Circuit's Judgment and Opinion and the bankruptcy court's Judgment. Mr. Ackermann's letter was not necessary. When your mother's house at 920 East Elm Street in Crowley is seized and sold, the only documents that will need to be presented to prove your debt are the 5th Circuit's Judgment and Opinion and the bankruptcy court's Judgment. Mr. Ackermann's letter will not be necessary. And I am confident that the judges of the 15th Judicial District, who have grown weary of your abuses of the judicial process, will readily ignore the trust that you created to protect your mother's house. The house will be seized and sold to satisfy another portion of the debt you owe the Bell Family Trust. No court will view Mr. Ackermann's letter as having any effect whatsoever on the amount of your debt owed to the Bell Family Trust.[33]

Later the same day, Wednesday, July 12, 2023, the Trustee responded to a series of documents provided by Ms. Bell with a final warning:

> You have lost every legal battle against the Bell Family Trust since I was appointed Trustee. You are once again fighting a losing battle. You will lose this legal battle and may lose your mother's house. Do you really want to spend the rest of your days fighting a losing battle and without a

[30] *Id.* at 45-47, 49, 53-54, 62, and 66-67.
[31] *See id.* at 46 ("I do not see Mr. Ackermann's letter as having any effect on the amount of your debt, notwithstanding the fact that the 5th Circuit rendered its Judgment and Opinion six days after Mr. Ackermann's letter. The timing of Mr. Ackermann's letter, and the letter itself are irrelevant in determining the amount of debt owed to the Bell Family Trust.")
[32] *Id.* at 45-47, 49, 53-54, 62, and 66-67.
[33] *Id.* at 46 (email sent from Greg Mier on July 12, 2023, at 10:18 am).

> place to live? Let's stop the madness and terminate the Bell Family Trust so that you can move on with your life.[34]

The madness did not abate, as Ms. Bell apparently instituted litigation against the Trustee in Louisiana state court contesting the Trustee's accounting. The Trustee convinced the state court to pause that litigation, alleging that Ms. Bell was prohibited by a federal court Order from pursuing litigation against the Trust, Trustee, and/or the beneficiaries of the Trust. This assertion by the Trustee was false. *See In re Bell Fam. Tr.,* No. 02-50477, 2025 WL 3671191 (Bankr. W.D. La. Dec. 16, 2025) (slip copy); Mem. Opinion and Order, (12/16/2025), ECF 283 (parallel citation) (finding that there are no Federal Court Orders currently prohibiting Ms. Bell from filing actions against the Trust or Trustee in state court).

## F. The Judgment of Revival and Ms. Bell's Motion for Sanctions

After the Court granted the Judgment of Revival on August 5, 2025, Ms. Bell filed two Motions in this Court. The first was a Motion for Sanctions against the Trustee, claiming that he obtained the Judgment of Revival through fraudulent means, because, according to Ms. Bell, the Judgment has been paid. Second, she filed a Motion for Clarification, seeking determination of whether she is barred by a federal court order from filing litigation against the Trustee in state court.

The October 7, 2025, hearing on these motions was contentious. On the one hand, Ms. Bell was repeatedly admonished by the Court for referring to the Trustee as a "liar" with respect to his accounting. She also very forcefully contested the Trustee's assertion that the distributions due to her under the terms of the Trust agreement, but retained by the Trust, were insufficient to pay the Judgment in full. She also argued during the October 2025 hearing that the Trustee was seeking a double recovery. She attempted to introduce what she referred to as a "corrected"

[34] *Id.* at 50 (email sent from Greg Mier on July 12, 2023, at 2:20 pm) and 68 (duplicative).

accounting that she claims shows that she overpaid the Judgment. At the time, the court did not accept the accounting since it was unclear who had prepared it.

On the other hand, the Trustee objected to her corrected accounting, claiming it was not accurate because it was contrary to the Trust's official accounting. He argued during the October hearing that Ms. Bell had not made any payments on the Judgment, and that the full Judgment, which he claimed exceeded $530,000.00, remained due and owing with interest. Additionally, he was not forthcoming with respect to how Ms. Bell's share of distributions should be accounted for with respect to the Judgment. Further, he asserted vague arguments during the October 2025 hearing concerning the property that allegedly had not been returned to the Trust. He claimed that Ms. Bell had potentially not returned the Nedia Bell Note and common stock in Kaplan Farmers Co-Op, Inc. It was unclear at the hearing whether the Trustee was complaining about these items not being returned, or alternatively, acknowledging they were returned, but defectively returned, because, according to him, Ms. Bell had written cancelled on both the note and the stock certificate.

In a December 16, 2025, opinion and order, this Court denied the Motion for Sanctions, finding that under applicable law the Judgment of Revival had been properly granted, and noting the appropriate ground to challenge a judgment of revival was through the instant motion.[35]

## G. The Contradictory Motion and the Parties' Positions

Thereafter, Ms. Bell filed the Contradictory Motion presently before the Court, seeking to annul the Judgment of Revival on the grounds that the Judgment was satisfied before the Trustee filed the Moton to Revive the Judgment. Her arguments are straightforward. She claims that all Trust Property was returned to the Trust

---

[35] *In re Bell Fam. Tr.,* No. 02-50477, 2025 WL 3671191 (Bankr. W.D. La. Dec. 16, 2025) (slip copy); Mem. Opinion and Order, (12/16/2025), ECF 283 (parallel citation). The Court also held that Ms. Bell was prohibited from pursuing frivolous claims in federal court concerning the Trust but concluded that she could file a contradictory motion asking the court to determine whether the Judgment had been satisfied. The Court also found that there were no current federal orders in place that would bar Ms. Bell from pursuing claims against the Trust and/or Trustee in state court.

shortly after the Judgment was rendered in 2005, thus entitling her to have the damage award in Paragraph 2 of the Judgment, which is $266,468.60, deemed satisfied. She also argues that her garnished income, the Trustee's retention of distributions due to her as a beneficiary of the Trust, and the proceeds from the sale of her Lafayette home, are more than enough to pay the remainder of the Judgment, including pre- and post-judgment interest.

The Trustee asserts two arguments in opposition. First, he claims that Ms. Bell is not entitled to the benefit of her garnished wages, proceeds from the seizure and sale of her home, or the distributions that were payable to her as a beneficiary but retained by the Trust because, according to him, she did not voluntarily pay the Judgment and because she refused to accept the consequences of the Judgment. His argument is essentially that because she did not "lift a finger" to pay the Judgment from her own funds and has attempted to impede the Trustee in selling Trust property, she is not entitled to the benefit of those payments. Thus, he contends Ms. Bell still owes the full amount of the original Judgment of more than $531,000.00 plus interest.

Alternatively, he contends that Ms. Bell is not entitled to have the damages awarded in Paragraph 2 of the Judgment deemed "satisfied" because he claims Ms. Bell cannot prove she returned all Trust property, which is essentially the argument he was making during the October 2025 hearing. But his list of potentially unreturned property has changed. He now argues that Ms. Bell cannot prove return of the following items: (i) the Wilfred Bell Note, (ii) the Nedia Bell Note, and (iii) $1,141.51 in cash. To be clear, the Trustee contends that because Ms. Bell cannot prove that these items were returned, which have a collective face value of less than $60,000.00, she gets no credit against the $266,468.60 in damages awarded in

Paragraph 2 for the real estate and mineral interests that indisputably were conveyed back to the Trust.[36]

## DISCUSSION

Article 2031B of the Louisiana Code of Civil Procedure authorizes a judgment debtor to seek annulment of a judgment of revival if the judgment debtor can show "the judgment which has been revived was in fact satisfied prior to the signing of the judgment of revival."[37] If the judgment debtor is successful in proving that the revived judgment was satisfied, the judgment debtor is entitled to court costs, fees, and attorney's fees incurred in contesting the ex parte motion to revive judgment. Under Article 2031B, the judgment debtor's rights are limited to showing that the revived judgment was satisfied. Defenses against the original action cannot be asserted as a basis for contesting the judgment of revival. The judgment debtor, Ms. Bell, has the burden of proof.

The Court finds that Ms. Bell has carried her burden of showing that the Trust has collected $322,936.19 from her consisting of the following: (i) $20,179.40 from the garnishment of her wages; (ii) $273,550.00 through the retention of her beneficiary share of distributions from the Trust; and (iii) $29,206.79, representing the net proceeds from the sheriff's sale of her home.[38] Nonetheless, the Trustee contends that Ms. Bell is not entitled to any credit for these amounts.[39] His only justification for

---

[36] Though the Trustee initially attempted to dispute return of the real estate and mineral interests to the Trust at the hearing, claiming he "didn't know," he eventually admitted that he has since sold all the Trust's properties.

[37] LA. CODE CIV. PROC. art. 2031B; *See In re Bell Fam. Tr.,* 2025 WL 3671191 for a discussion of why Louisiana law applies in determining whether the Judgment has been satisfied.

[38] *See* Background Section D of this Opinion for a discussion of the Trust's collection activities and the discrepancies between the parties' Amortization Tables.

[39] The Trustee claims Ms. Bell has not paid the amounts due:

- "Numbered paragraph 1 requires Ms. Bell to pay the Trust $162,214.96 plus interest. Ms. Bell did not pay this amount." *See* Opp'n Br./Mem. to Contradictory Mtn. art. 2031B, (01/29/2026), ECF 303 at 5.
- "[N]umbered paragraph 5 requires Ms. Bell to pay the Trust $18,009.97 plus interest. Ms. Bell did not pay this amount." *See id.* at 11.

refusing to give her credit is his assertion that Ms. Bell was required to voluntarily make payments in order to get credit against the Judgment.

The Trustee did not cite any legal support for this argument, and the Court is not aware of any law that states that a judgment debtor only gets credit for payments voluntarily made. To the contrary, it is obvious that if a judgment creditor takes steps allowed by law to collect the judgment, such as by garnishing the judgment debtor's wages, or seizing and selling the judgment debtor's home, as occurred in this case, then the net proceeds realized from those actions will reduce the amount owed by a corresponding amount. Moreover, Louisiana's compensation law, which is similar to the doctrine of setoff, would require that all collected amounts, including the distributions owed to a beneficiary of a trust, but retained by the Trust, be set off against the debt owed to the trust by the beneficiary.[40]

The Trustee certainly appears to understand this commonsense rule, because his own accounting records provide Ms. Bell with various credits against the Judgment for the retained distributions and for the proceeds received from the sale of her home. Further, he stated in the Draft Termination Agreement, which he provided to all the Trust beneficiaries in June 2023, that he had applied these payments to the Judgment: "Over the years since the rendering of the August 1st Judgment, offsets have been applied to the amount of the money owed on the Judgment."[41]

Simply put, there is no support for the Trustee's assertion that Ms. Bell gets no credit for the amounts the Trust collected, and his arguments otherwise are belied by his own accounting. Therefore, the Court finds that Ms. Bell is entitled to a credit against the Judgment in the amount of $322,936.19.

---

[40] *See* LA. CIV. CODE art. 1893 ("Compensation takes place *by operation of law* when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount . . .") (emphasis added).

[41] Obj. and Rebuttal to the Gregory Mier Opp'n to Bell's Contradictory Mtn., (02/06/2026), ECF 308 at pg. 37 of 99.

Of course, $322,936.19 is not enough to pay the principal balance of the Judgment of $446,693.53, much less the pre- and post-judgment interest. However, it does appear sufficient to pay the Judgment, with interest, if the damages awarded in Paragraph 2 of the Judgment are deemed satisfied.

Assuming the damages in Paragraph 2 are satisfied, then Ms. Bell would owe the damages awarded in Paragraphs 1 and 5 only, which are $162,214.96 and $18,009.97, respectively, and collectively total $180,224.93. Additionally, she would owe the prejudgment interest on the total principal balance of the Judgment of $446,693.53, which the Court determined to be $62,711.49.[42] Thus, the total amount due as of the Judgment date of August 1, 2005, would be $242,936.42. After applying the amount the Trust has collected, $322,936.19, against this amount, the Trust should still be holding $79,999.77 attributable to its collections from Ms. Bell. Therefore, the Trust has collected enough to pay the principal balance plus the prejudgment interest on the total amounts awarded under the Judgment.

The next question is whether the remaining $79,999.77 is enough to cover the post-judgment interest on $242,936.42. The answer is not straightforward because neither party provided the Court with a calculation of the post-judgment interest that would be due assuming the damage award in Paragraph 2 is deemed satisfied. Ms. Bell's Amortization Schedule calculated post-judgment interest on $180,224.93 (the total of the amounts awarded in Paragraphs 1 and 5 of the Judgment), but she omitted the prejudgment interest, making her calculations of post-judgment interest inaccurate.[43]

The Trustee's Amortization Schedule includes prejudgment interest, but the amount of that interest is overstated in his Schedule by $22,496.39.[44] Moreover, his

---

[42] *See* Background Section C of this Opinion for a discussion of the Court's determination of the amount of prejudgment interest.

[43] *See Richmond Capitol Corp. v. Fed. Express Corp.,* 54 F.Supp.2d 676, 676-77 (M.D. La. 1999) (holding that post-judgment interest should be applied to the full amount of the judgment, including pre-judgment interest.).

[44] *See* Background Section C of this Opinion.

calculation assumes that the damages in Paragraph 2 have not been satisfied and thus remain owing throughout. He also did not give Ms. Bell credit for the garnished wages.

To fill this gap, the Court has made an estimate of what the total post-judgment interest charge would be, assuming the damage award in Paragraph 2 is deemed satisfied. To make this estimate, the Court is assuming that the post-judgment interest calculated by the Trustee would be proportionately reduced by the damages awarded in Paragraph 2, \$266,468.60, and by the amount of the overstatement of prejudgment interest, \$22,496.39.

The following illustrates the calculation. The numerator of the ratio is the total amount calculated as being owed as of August 1, 2005, under Paragraphs 1 and 5 of the Judgment plus prejudgment interest, which is \$242,936.42 (\$162,214.96 + \$18,009.97 + \$62,711.49).[45] The denominator is the total amount shown as being due on August 1, 2005, by the Trustee, which is \$531,901.41.

$$\frac{\$242{,}936.42}{\$531{,}901.41} = 0.457$$

This gives a ratio of 0.457, meaning that the percentage of the Judgment owed, assuming the amounts owing in Paragraph 2 are satisfied, is 45.7% of the total reflected as of August 1, 2005, on the Trustee's Amortization Schedule. The Trustee shows that the total post-judgment interest running from August 1, 2005, through 2022 is \$116,215.59. To determine the approximate post-judgment interest that would have accrued if paragraph 2 is satisfied, the Court multiplied \$116,215.59 by the ratio from above, 0.457. This yields an approximate post-judgment interest amount of \$53,110.52.[46]

---

[45] This number, \$242,936.42, can also be determined by subtracting the damages awarded in Paragraph 2, \$266,468.60 and the amount of the overstatement of prejudgment interest, \$22,496.39, from the total shown on the Trustee's Amortization Schedule as of August 1, 2005 (\$531,901.41 − \$266,468.60 − \$22,496.39 = \$242,936.42).

[46] Put another way, the total owed as of August 1, 2025, assuming satisfaction of Paragraph 2's damage award as of August 1, 2005, is 54.3% less than that shown in the Trustee's Amortization Schedule as

$$\$116{,}215.59 \times 0.457 = \$53{,}110.52$$

The product, $53,110.52, is the approximate amount of post-judgment interest that would have accrued had the Trustee provided credit for the returned property as of August 1, 2005, and had not overstated the prejudgment interest.

As shown above, the Trust would have $79,999.97 remaining after paying the damages awarded in Paragraphs 1 and 5, plus all prejudgment interest. The difference between $79,999.97 and $53,110.52 is $26,889.45, which means the Trustee would likely have more than enough to cover all post-judgment interest due on the Judgment, assuming the damages awarded in Paragraph 2 are deemed satisfied.

Note, however, that the Court's assumptions regarding the post-judgment interest that would be due assumes that the Trust property was returned on the date of Judgment, August 1, 2005. Most of that property was not returned until November 9, 2005, which is the date the chapter 7 trustee's Rule 7070 Motion was granted. This means the full amount of damages, plus prejudgment interest, which is $509,405.02 ($446,693.53 + $62,711.49) would have accrued post-petition interest for 100 days (the difference between August 1, 2005 and November 9, 2005).

The initial post-judgment interest rate per the Trustee's Amortization Schedule was 3.62%, which equates to a per diem of $50.52 (calculated as follows: $509,405.02 x 3.62% = $18,440.46 / 365 = $50.52). Thus, the post-judgment interest on the full damage award through November 9, 2005, would have been $5,052.00 ($50.52 x 100). After accounting for this additional interest, it appears the Trustee would still be holding approximately $21,700.00 more than necessary to pay the full

---

of that date and the post-judgment interest would be approximately 54.3% less than that shown. The Trustee shows that the total post-judgment interest running from August 1, 2005, through 2022 is $116,215.59, and 54.3% of that amount is $63,105.07. To arrive at an approximation of the post-judgment interest requires $63,105.07 to be subtracted from $116,215.59. This provides a difference of $53,110.52, which approximates the post-judgment interest assuming the damages in Paragraph 2 are deemed satisfied.

Judgment with interest, again, assuming the damages awarded in Paragraph 2 are deemed satisfied by the return of Trust property.

The focus now turns to whether the damage award in Paragraph 2 of the Judgment has been satisfied. Ms. Bell asserts it has because she returned all the Trust property, although this is disputed by the Trustee. Her primary argument is that the Trust is receiving a duplicate recovery if she is not given credit for the property returned to the Trust. In support of that argument, she relies upon the Ackermann Letter. Ms. Bell also asserts that Louisiana law and federal law prohibit duplicate recoveries of the same damages, citing *Bradley v. Allstate Ins. Co*, 620 F.3d 509 (5th Cir. 2010).

The Trustee sees it differently. He contends the damage award in Paragraph 2 of the Judgment is not satisfied because Ms. Bell cannot prove she returned the Wilfred Bell Note, the Nedia Bell Note, and $1,141.51 in cash, which collectively have a face value of less than $60,000.00.[47] In essence, the Trustee is attempting to parlay these three items of nominal value into $266,268.60—the full amount of damages awarded in Paragraph 2—as he contends Ms. Bell was required to return these items of Trust property in order to have the damages award in Paragraph 2 deemed satisfied. He couches his argument on an interpretation of the Judgment that requires the return of all property to get any credit. He also admonished the Court during the hearing on this matter that the Court had no right to read the Judgment any differently because it may subject him to personal liability.

Addressing the parties' arguments requires the Court to interpret the Judgment. At the outset, the Court rejects the Trustee's assertion that this Court does not have the right to interpret the Judgment. As the United States Supreme

[47] As noted in Background Section F of this Opinion, during the October 7, 2025, hearing on Ms. Bell's Motion for Sanctions, the Trustee asserted that Ms. Bell had not returned the stock in the Kaplan co-op. However, the Trustee omitted this argument in opposition to Ms. Bell's Contradictory Motion. Since Ms. Bell insists that she returned the stock to the Trust on October 4, 2005, it may be the Trustee was able to locate the stock certificates. Regardless, the Trustee and Trust have waived this issue by not pursuing it in opposition to the Contradictory Motion presently before the Court.

Court noted in *Travelers Indem. Co. v. Bailey*, bankruptcy courts "plainly [have] jurisdiction to interpret and enforce [their] own prior orders."[48]

In interpreting the Judgment, the Court will employ "general principles of contract interpretation . . . by reference to what is within the four corners of the order itself."[49] "[E]ven when the language of the [judgment] is clear, courts should refrain from construing the [judgment] in such a manner as to lead to absurd consequences."[50] But "[t]he absurdity bar is high, as it should be. The result must be preposterous, one that no reasonable person could intend."[51] If an interpretation leads to an absurd result, this Court may look to extrinsic evidence as an aid in determining the meaning of the judgment's language.[52]

Turning to this case, interpreting the Judgment as the Trustee advocates would produce an absurd result because it would provide the Trust with a duplicate recovery. It is undisputed that the Trust obtained record title to its most valuable assets—the farmland, Wilfred Bell's home and surrounding land, and mineral

---

[48] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195, 2205, 174 L. Ed. 2d 99 (2009) (In addressing the issues of whether the bankruptcy court had subject matter jurisdiction to clarify an order entered 10 years earlier, the court stated: "The answer here is easy: as the Second Circuit recognized, and respondents do not dispute, the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *see also Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 78 L.Ed.1230 (1934).

[49] *Port Marigny, LLC v. City of Mandeville*, 2024 WL 1406486, at *2 (E.D. La. Apr. 2, 2024), *reconsideration denied*, 2024 WL 2746833 (E.D. La. May 29, 2024) (interpreting a consent judgment) (citing *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349-350 (5th Cir. 1998)); *see also Shale Consultants, L.L.C. v. Wilson*, 2013 WL 4750066, at *4 (W.D. La. Sept. 3, 2013).

[50] *Id.*, (quoting *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 112 So. 3d 187, 192 (La. 2013) and citing La. Civ. Code art. 2046 ("When words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.)).

[51] *Cristea v. ArborPro, Inc.,* 701 F. Supp. 3d 441, 447 (E.D. La. 2023) (citing *Texas Brine Co., L.L.C. v. American Arbitration Assoc., Inc.*, 955 F.3d 482, 486 (5th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 237 (2012))) (internal quotations omitted); *see also Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F. 3d 737, 742 (5th Cir. 1998) ("Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit.").

[52] *Thomas v. Bankers Specialty Ins. Co.,* 2024-0043, p. 8 (La. App. 4 Cir. 6/25/24), 398 So. 3d 29, 35 ("[W]here the terms of the agreement are unclear, ambiguous or will lead to absurd consequences, the court may go beyond the original agreement to determine the true intent of the parties.") (citing *Rabenhorst Funeral Home, Inc. v. Tessier*, 1995-1088, p. 4 (La. App. 1 Cir. 5/10/96), 674 So.2d 1164, 1166)).

interests—through the Rule 7070 Motion, which was granted on November 9, 2005. Based on the accounting documents in the record, these properties have generated more than $1,600,000.00 net of costs and expenses to the Trust since August 1, 2005, which equates to more than $270,000.00 for each beneficiary. Yet, the Trustee contends Ms. Bell gets no credit against the damages awarded in Paragraph 2 for the return of these properties because she cannot show that she returned two promissory notes and a small sum of cash. In the Court's view, no reasonable person would interpret the Judgment this way, particularly given the results the Trust has realized from the returned Trust properties in relation to the face value of the notes.

Moreover, the Trustee's interpretation gives a result that appears contrary to Louisiana law, which "does not allow for double recovery of the same element of damages."[53] "Double recovery would be in the nature of exemplary or punitive damages which are not allowable under Louisiana law unless expressly provided for by statute."[54] This rule has been respected by the Fifth Circuit.[55]

Requiring Ms. Bell to pay the full sum awarded in Paragraph 2, which represents the consideration for the transfer of the Trust property, after the Trust property was returned, would result in a duplicate recovery to the Trust. Since duplicate recoveries are prohibited by law, the Court must interpret the Judgment to avoid such a result. Accordingly, Ms. Bell should be provided with credit against the damage award in Paragraph 2 of the Judgment for the property returned.

Finally, the Court notes the Fifth Circuit's concern that the Judgment could be interpreted as providing the Trust with a double recovery for the same damages. As discussed above, the Fifth Circuit, by letter, requested that the Trust address this concern. In response, the Trust assured the Circuit Court that there could be no duplicate award: "The preferred remedy is restoration of the trust property and upon

---

[53] *Albert v. Farm Bureau Insurance Company,* 05–2496, p. 4 (La.10/17/06), 940 So.2d 620, 622.
[54]*Gagnard v. Baldridge,* 612 So.2d 732, 736 (La.1993) (citing *International Harvester Credit v. Seale,* 518 So.2d 1039 (La.1988)).
[55] *See Bradley v. Allstate Ins. Co*, 620 F.3d 509 (5th Cir. 2010).

the same the monetary award of $266,468.60 is satisfied. ***As such there seems like there can be no duplicate recovery or duplicate award.***"[56] Now, in the face of the Trust's representation to the Fifth Circuit, "that there can be no duplicate recovery," the Trust asks this Court for precisely that relief.

The Trustee contends that the Court must ignore this letter because it is not the Judgment. While the Court agrees that the letter cannot vary the Judgment, it disagrees as to its importance to the issues addressed here, particularly given the absurd result produced by the Trustee's interpretation. The Fifth Circuit was obviously sensitive to the possibility that the Judgment could be interpreted as providing a double recovery. As explained above in the discussion of the appeal of the Judgment, the Circuit relied upon the Trust's letter to vacate the damages awarded in Paragraph 3 of the Judgment because it was duplicative of an element of damages awarded in Paragraph 1.

While it is impossible to say whether the Fifth Circuit relied upon the Trust's assertion "that there can be no duplicate recovery or duplicate award," in deciding not to vacate or clarify Paragraph 2 of the Judgment, it is a reasonable possibility. All that can be said at this point is more than 21 years later, the Trust is now arguing for a duplicate recovery. The Trust's interpretation not only produces an absurd result, it is prohibited by law because it would allow the Trust to receive a double recovery for the same damages, something it assured the Fifth Circuit would not occur.

Accordingly, the Court finds that the damage award in Paragraph 2 of the Judgment has been satisfied at least as to the Trust property that was returned. This means that, at most, Ms. Bell may still be responsible for the items allegedly not returned—the Wilfred Bell Note, in the amount of $40,000.00, the Nedia Bell Note,

---

[56] Ackermann Letter, ECF 311 at Bell Ex. 3 (emphasis added).

in the amount of $16,279.13, and $1,141.51 in cash. The focus now shifts to those items.

The Court will first address the Wilfred Bell Note. Although this Note was never property of the Trust, as it was made payable to Sue Bell individually, the Judgment nonetheless required Ms. Bell to convey this Note to the Trust. There is nothing in the record showing that Ms. Bell returned this Note. Nor does it appear the chapter 7 trustee ever attempted to recover and enforce this Note in the seven years the Trust remained in bankruptcy following entry of the Judgment, and this Note would certainly have prescribed during that period.[57]

The Trustee's primary argument is that because there is no proof that the Wilfred Bell Note was returned within 20 days of the Judgment being rendered, Ms. Bell should be liable for the total damage award in Paragraph 2 of the Judgment.

The Court disagrees. The only value the Wilfred Bell Note had to the Trust was its inherent enforceability and ultimate collectability. But enforcing the Note here would not have changed one aspect of this case. This is because Wilfred Bell was deceased as of the date of the Judgment.[58] Thus, to collect on this Note, the Trust would have had to pursue the Wilfred Bell succession and the collateral securing the Note.

Wilfred Bell's succession likely would not have had any assets because he had transferred all his assets to the Trust. Included in the transferred assets was the collateral securing the Wilfred Bell Note. Thus, pursuit of the Wilfred Bell Note would have been a vain and useless act, as there would be nothing for the Trust to recover. It had already been placed in possession of the collateral securing the Note under the terms of the Judgment and the granting of the Rule 7070 Motion on November 9, 2005.

---

[57] In Louisiana, promissory notes or subject to a five-year prescriptive period running from the time the note is payable. *See* LA. CIV. CODE art. 3498.
[58] Wilfred Bell died on March 1, 2004.

The Trustee nonetheless contends that because Ms. Bell reinscribed the mortgage that secured the Wilfred Bell Note in 2015, this meant she was in possession of that Note.[59] The Court does not know how Ms. Bell was able to get the mortgage reinscribed, but agrees that Ms. Bell was wrong to have taken such action in light of the Judgment. Indeed, the Louisiana Third Circuit Court of Appeal concluded the reinscription was improper because the Wilfred Bell Note and corresponding mortgage were extinguished by confusion under the terms of the Bankruptcy Court's Judgment on August 1, 2005, as the qualities of both obligor and obligee under the Note were united in the Trust.[60] This is essentially the same point this Court is making regarding the enforceability and collectability of the Note against the succession of Wilfred Bell after the August 1, 2005, Judgment was rendered.

The Louisiana Third Circuit also recognized that Ms. Bell's reinscription of the mortgage harmed the Trust and awarded damages to the Trust in the amount of attorney's fees and costs incurred to have the reinscription cancelled. Thus, the Trust was given a remedy as a result of Ms. Bell's actions in reinscribing the mortgage, and this Court's findings here have no effect on that remedy.

In summary, Wilfred Bell was deceased as of the date of the Judgment, and his estate had no assets to pay the Note. The only recovery available to the Trust would be against the property subject to the mortgage that was securing the Wilfred Bell Note, and the Trust was placed back in possession of that property on November 9, 2005. Thus, there was nothing additional to be gained by the Trust in pursuing the Wilfred Bell Note. This explains why the chapter 7 trustee likely took no action to

---

[59] Ms. Bell's reinscription of the mortgage against the Trust property caused the Trust to engage in litigation in Louisiana state court to have the mortgage cancelled. *See Bell Family Trust v. Vermilion Parish Clerk of Court*, 338 So. 3d 537 (La. App. 3 Cir. 4/27/22).

[60] *See Bell Family Trust v. Vermilion Parish Clerk of Court*, 338 So. 3d at 550; *see also* LA. CIV. CODE art. 1903 ("When the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion.").

enforce and collect on that Note during his seven-year administration of the Trust following the granting of the Judgment.

Accordingly, the Trustee's argument that Ms. Bell must remain liable for damage award in Paragraph 2 of the Judgment, or even for the face amount of that Note, based on her failure to return the Wilfred Bell Note lacks merit. Simply put, the Trust collected all it possibly could have collected on this Note when it was placed back in possession of Wilfred Bell's home and surrounding land through the Judgment granting the Rule 7070 Motion on November 9, 2005.

Moving to the Nedia Bell Note, this Note evidenced a $16,279.13 loan by the Trust to Nedia Bell, the mother of all the beneficiaries of the Trust. The Note was dated August 31, 2001, and was secured by a mortgage on Nedia Bell's home located in Acadia Parish, Louisiana. It was payable upon the death of Nedia Bell, and she died on June 8, 2012.[61]

The parties dispute whether the Nedia Bell Note was returned. Ms. Bell claims it was, testifying that she remembers mailing it to Mr. Ackermann on October 4, 2005. The Trustee claims it was not because it is not in his possession. He also submitted an affidavit from Mr. Ackermann in which he states he "does not recall" receiving the Nedia Bell Note.[62] Since both parties are relying on memories over two decades old, the Court is unable to conclude with any certainty that Ms. Bell returned the Note, although it seems, based on assertions made by the Trustee during the

---

[61] Official Obituary of Nedia Leleux Bell, GEESEY FERGUSON FUNERAL HOME, https://www.geesey-ferguson.com/obituaries/Nedia-Leleux-Bell?obId=5253723. Under Louisiana law, a promissory note which included the phrase 'due at death' meant payable at the maker's death. *Succession of Vidrine*, 377 So. 2d 564 (La. Ct. App. 1979), *appeal after remand Fontenot v. Vidrine's Estate,* 401 So.2d 584 (La. App. 3 Cir. 1981); *see also Validity of Instrument for payment of money as affected by mere fact that payment is postponed until death*, 2 A.L.R. 1471 (originally published in 1919) ("The general rule is that an instrument in the form of, and otherwise valid as, a note. . . or other instrument for the payment of money, is not rendered invalid as such, merely because payment is postponed until, or after, death." Nor are they "regarded as void for uncertainty as to time of payment. . ."). The parties did not address the payment terms of the Nedia Bell note in relation to validity or prescription. Accordingly, the Court assumes, but is not deciding, that the Nedia Bell Note, which was payable at Nedia Bell's death, is valid and that prescription would have commenced on the Note at Nedia Bell's death.

[62] *See* Opp'n Br./Mem. to Contradictory Mtn. art. 2031 B, (01/29/2026), ECF 303 at Ex. 9.

October 2025 hearing, that it was returned, but marked cancelled when returned. Because the Court's decision does not turn on this issue, the Court will simply assume it was not returned and consider the Trustee's other arguments.

The Trustee argues that Ms. Bell should remain liable for the damage award in Paragraph 2 of the Judgment because she fraudulently caused the mortgage on Nedia Bell's home to be cancelled in 2009, which then allowed Nedia Bell to donate the home to Ms. Bell with a clear title in 2011. Because of this, he asserts that the Court should allow him to pursue Ms. Bell in state court so that he can attempt to have these transactions voided and force a sale of Nedia Bell's home, in further payment of the Judgment rendered by this Court in 2005. He also argued during the hearing that the actual Note was required for the Trust to enforce the obligation, and that Ms. Bell's failure to turn over the Note somehow caused prescription to be tolled.

The Trustee did not present any evidence in support of his assertion that Ms. Bell fraudulently cancelled the mortgage on Nedia Bell's home. But it is not a far stretch for the Court to believe that she did so. Ms. Bell has never accepted the Judgment against her and has engaged in frivolous litigation in the Western District of Louisiana over the last 20 years in a futile attempt to have the Judgment reversed. As discussed above, she also improperly caused the reinscription of the mortgage on Wilfred Bell's home in 2015 despite its clear invalidity at that time. Thus, it seems likely she may have taken action to thwart enforcement of the mortgage on Nedia Bell's home. The Trustee's frustration with Ms. Bell is understandable, including the desire to hold Ms. Bell accountable for these actions. He claims that his only avenue for doing so at this point is through enforcement of the Judgment.

The problem the Trustee faces is prescription. The Note was payable on Nedia Bell's death, which was June 8, 2012, which means the five-year prescriptive period

to enforce the Note against her succession likely commenced at that time.[63] It would have run on June 8, 2017.

Moreover, Ms. Bell was not the obligor under the Nedia Bell Note; Nedia Bell's succession was responsible for paying that Note. The value of the Note to the Trust was its ultimate enforceability and collectability against the succession. Had the Trustee diligently pursued collection, it is likely that the alleged transfers that Ms. Bell caused would have been discovered on the public records in sufficient time for the Trust to have taken appropriate legal action to have them voided.

Further, Louisiana law provides a straightforward procedure to preserve claims against successions, which the Trust would have been required to follow to preserve collection of the Note.[64] It requires the opening of a succession and the filing of a claim. Here, Nedia Bell's heirs, who are the beneficiaries of the Trust, could have opened the succession. Then, the Trust could have submitted a written claim to the succession representative based on the Nedia Bell Note as well as this Court's August 1, 2005, Judgment, and, upon acknowledgement, this would have interrupted prescription on the Note for as long as the succession remained under administration.[65] Possession of the Note would not have been required to preserve the claim, particularly here since the Trust beneficiaries are the heirs of Nedia Bell and could have acknowledged the debt. Louisiana law also provides a procedure for creditors to preserve claims even without supporting documentation.[66]

---

[63] *See* LA. CIV. CODE art. 3498, which provides a five-year prescriptive period for promissory notes whether they are negotiable or nonnegotiable. Thus, the Nedia Bell Note would have prescribed, at the latest, in June 2017.

[64] *See* LA. CODE CIV. PROC. art. 3241 *et seq.*

[65] *See* LA. CODE CIV. PROC. art. 3243 (3) ("The acknowledgment of a claim by the succession representative. . . shall . . . (3) Suspend the running of prescription against the claim as long as the succession is under administration."). Even if the claim was somehow rejected, submission of the claim would still suspend prescription for the duration of administration of the succession. *See* LA. CODE CIV. PROC. art. 3245 (C) and (D).

[66] *See* LA. REV. STAT. § 13:3721(4) ("Parol evidence shall not be received to prove any debt or liability of a deceased person against his succession representative, heirs, or legatees when no suit to enforce it has been brought against the deceased prior to his death, unless within one year of the death of the deceased . . . (4) The claimant has submitted to the succession representative a formal proof of his

There is no evidence showing the Trust ever took any steps to enforce the Nedia Bell Note against Nedia Bell's succession, and all indications are the Trust was going to be terminated without it ever attempting to enforce the Note.[67] It was not until Ms. Bell refused to approve the accounting that the Trustee threatened collection as leverage against Ms. Bell.[68] But the Trustee's right to collect the Note has prescribed, and the Court is not aware of any rule or law that would have tolled prescription on the Note, other than the Louisiana succession procedure discussed above, which apparently was not employed by the Trustee.

Accordingly, the Court finds that the Trust has lost its right to enforce the Note.[69] In reaching this decision, the Court certainly does not condone any actions that Ms. Bell may have taken to prematurely cancel the mortgage on Nedia Bell's home. By the same token, the Court cannot condone the Trust's lack of action to enforce this Note before it prescribed.

Finally, even if it is determined that Ms. Bell remains liable for the face amount of the Nedia Bell Note, as an element of damages under the Judgment, the Court finds that the Trust has already collected sufficient funds from Ms. Bell to cover this amount, with post-judgment interest. As noted above, the Trust has already collected more than the amount necessary to pay the Judgment, assuming the damages awarded in Paragraph 2 are fully satisfied, and this excess appears to be sufficient.

The Court also finds that the Trust has collected sufficient sums to have repaid the $1,141.51 cash that Ms. Bell allegedly did not return to the Trust. Accordingly, the Court rejects the Trust's argument that Ms. Bell remains liable for the damage

---

claim against the succession, as provided in Article 3245 of the Code of Civil Procedure") (emphasis added).

[67] *See* Background Section E of this Opinion for a discussion of the Draft Termination Agreement and the email exchange between Ms. Bell and the Trustee in which the Trustee indicated Ms. Bell could avoid losing her home (Nedia Bell's prior home) if she would "stop the madness."

[68] *Id.*

[69] The Court's opinion only addresses the ability of the Trust to enforce the Note against Nedia Bell's succession. The Court is not addressing whether the heirs of Nedia Bell have a claim against Ms. Bell for the alleged clandestine actions, such as a claim of nullity for lack of form, or any other claim.

award in Paragraph 2 based on her alleged failure to turn over this small amount of cash.

## CONCLUSION

It has been more than 21 years since the Court rendered the Judgment against Ms. Bell. In the course of that time the Trust has obtained title to all the Trust's immovable property and mineral interests, which has returned approximately $270,000.00 to each of the six beneficiaries during this time. The Trust has also collected more than $322,000.00 from Ms. Bell through the garnishment of her wages, withheld Trust distributions, and the sale of her home. The Court also finds that the damage award in Paragraph 2 of the Judgment has been satisfied.

The Trustee conceded at the hearing on the Contradictory Motion that if the Court finds the damage award in Paragraph 2 satisfied, then the Judgment against Ms. Bell is satisfied. For the reasons set forth above, the Court agrees. Under a reasonable interpretation of the Judgment, considering the evidence submitted by the parties, Ms. Bell has satisfied the Judgment, including pre- and post-judgment interest. Accordingly, the Court will enter an Order annulling the Revival of Judgment, as authorized under Article 2031B of the Louisiana Code of Civil Procedure.

###